CHICAGO, M. & ST. P. RY. CO. v. OLD COLONY TRUST CO. et al. †

(Circuit Court of Appeals, Eighth Circuit. July 29, 1914.)

No. 4103.

**1.** RAILROADS (§ 91*)—CROSSING OTHER RAILROADS—VALIDITY AND CONSTRUCTION OF AGREEMENT.

An electric railroad company, desiring to cross with its line the track and right of way of a steam railroad, entered into a contract with the railroad company by which it was given the right without charge to make a grade crossing at its own expense, with a provision that in case the railroad company should lower its grade, for which it had already made plans, the rights granted should cease and determine, but the electric company should be granted the right to build and maintain an overhead crossing at its own expense and in accordance with plans to be approved by the chief engineer of the railroad company. *Held*, that the contract did not terminate on the lowering of its tracks by the railroad company, but only the right of the electric company to a grade crossing; that it was not ultra vires on the part of the electric company, void as against public policy, nor inequitable, and bound the electric company to make the overhead crossing at its own expense.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 249–259; Dec. Dig. § 91.*]

**2.** RAILROADS (§ 89*)—NATURE OF RIGHT OF WAY—CROSSING AGREEMENTS—"INTEREST IN LAND"—"PRIVATE PROPERTY."

A railroad right of way is an interest in the land having the substantiality of a fee, and is private property, even to the public, in all else but an interest and benefit in its use. It cannot be appropriated by another in whole or in part, except on payment of compensation, and a contract by which one railroad company is given the right to build over the existing tracks and right of way of an older line is based on a valuable consideration.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 234–239; Dec. Dig. § 89.*]

**3.** RAILROADS (§ 89*)—CROSSING AGREEMENTS—VALIDITY UNDER IOWA STATUTES.

While Code Iowa 1897, § 2020, gives a railroad company the right to cross the line of another company, it does not give such right without the payment of compensation, and section 2063 expressly recognizes the right of the two companies to contract with respect to such crossing by providing that, if they cannot agree upon the terms, the existing road may apply to the District Court for relief.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 234–239; Dec. Dig. § 89.*]

**4.** RAILROADS (§ 90*)—CROSSING OTHER RAILROADS—COST OF CROSSINGS—EFFECT OF LOWERING GRADE.

An operating railroad, by changing its grades or putting in double tracks, does not thereby become the junior road in relation to another road, constructed after its own, whose tracks cross its right of way, so as to impose on it the burden of paying the cost of a new crossing.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 240–248; Dec. Dig. § 90.*]

**5.** RAILROADS (§ 89*)—CROSSING AGREEMENTS—VALIDITY AND EFFECT.

A contract by which an electric railroad company was given the right to make a crossing over the right of way and tracks of an existing steam railroad was not one required to be recorded by the laws of Iowa, nor one which imposed any lien upon the property of the electric company, and where it was legal under the laws of the state, and in terms provided that

it should be binding on the successors and assigns of the parties, it is valid as against subsequent mortgagees of such company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 234–239; Dec. Dig. § 89.*]

Appeal from the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Suit in equity by the Old Colony Trust Company and others against the Ft. Dodge, Des Moines & Southern Railroad Company. From a decree entered on its petition of intervention, the Chicago, Milwaukee & St. Paul Railway Company appeals. Reversed.

J. C. Cook, of Cedar Rapids, Iowa (John N. Hughes and C. R. Sutherland, both of Cedar Rapids, Iowa, and H. H. Field, of Chicago, Ill., on the brief), for appellant.

James C. Davis, of Des Moines, Iowa (S. R. Dyer, of Boone, Iowa, and George E. Hise, of Des Moines, Iowa, on the brief), for appellees.

Before HOOK and CARLAND, Circuit Judges, and REED, District Judge.

CARLAND, Circuit Judge. On June 4, 1910, the Ft. Dodge, Des Moines & Southern Railroad Company, hereinafter called the Electric Company, was placed in the hands of receivers by the Circuit Court for the Southern District of Iowa, in actions commenced therein by the Old Colony Trust Company and the American Trust Company, to foreclose as trustees for bondholders two certain mortgages, dated June 24, 1907. Pending the receivership and on July 5, 1913, the Chicago, Milwaukee & St. Paul Railway Company, hereafter called the St. Paul Company, on leave granted, filed in the court below an intervening petition, asking relief as against the Electric Company, and its receivers, relative to a certain contract entered into between the St. Paul Company and the Electric Company, September 5, 1906. This petition was answered by the two Trust Companies and the receivers. The Trust Companies and the receivers also filed supplemental bills asking affirmative relief, with reference to the provisions of the contract. The petition came on for hearing, and the court, after considering the pleadings and proofs, denied the relief asked for by the St. Paul Company, and granted affirmative relief against it as hereinafter stated. The St. Paul Company appeals.

The facts which condition the rights of the parties as they appear from the record are substantially as follows:

In 1881 and 1882 the St. Paul Company built a line of railroad across the state of Iowa, extending its Illinois lines from a point at Savannah, Ill., across the Mississippi river, through Huxley, Iowa, to the city of Council Bluffs, on the western boundary of Iowa, and it is now operating said line of railroad, and at all times since 1882 has operated the same. Said line of road was a single-track road, with sharp curves and steep grades. The deed which conveyed the

right of way to the St. Paul Company through the town of Huxley, after describing the right of way, contained the following language:

"Do hereby grant, bargain, sell and convey unto the said company, for all purposes connected with the construction, use and occupation of said railway, the right of way over and through the following described tract of land in Story county, Iowa, described as follows, to-wit:  *  *  *  To have and to hold the same in fee simple, absolute, unto the said company, its successors and assigns, forever."

In 1906, the Electric Company projected an extension of its railroad from Boone, by way of Des Moines Junction, to Des Moines, which would cross the St. Paul Railroad at Huxley. Negotiations were had between the St. Paul Company and the Electric Company with reference to the proposed crossing. Mr. Blake, who was general manager of the Electric Company, represented it in these negotiations. At the hearing in the court below Mr. Blake testified as follows:

"I cannot recall when I first knew that the Milwaukee Company contemplated lowering the grade of its tracks through Huxley, or when my attention was first called to the matter of changing the grade; but it was one of the requirements in the contract, and I knew of that fact prior to the time the contract was made. In the letter I stated that I had heard that they were likely to lower their tracks at that point some time, and in case they did so in a year or two or three or more, the contract should necessarily read that we build over them at that point. They required that provision in all the negotiations. They would not consider a contract otherwise. I did not understand how much they proposed lowering their grade or track. I do not remember having a conversation with Mr. Foster or Mr. Laas with regard to it. I did know that the lowering of the track was in contemplation, but did not know the exact amount of lowering."

As the result of the negotiations a contract was made and entered into by and between the St. Paul Company and the Electric Company, the material portions of which, so far as this controversy is concerned, are as follows:

"This agreement, made this 5th day of Sept., A. D. nineteen hundred and six, by and between the Chicago, Milwaukee & St. Paul Railway Company, hereinafter called the 'St. Paul Company,' and the Ft. Dodge, Des Moines & Southern Railway Company, hereinafter called the 'Electric Company,' witnesseth:

"That the St. Paul Company, in consideration of the sum of one dollar to it paid by the Electric Company, the receipt whereof is hereby acknowledged, and in further consideration of the performance by the Electric Company of all its covenants and agreements herein contained, hath granted and by these presents doth grant unto the Electric Company the right to construct, maintain and operate a single track electric railway over and across the right of way and main track of the St. Paul Company, at a point near the town of Huxley, in the state of Iowa, which said point is marked 'A' on the plat hereto attached, marked 'Exhibit A,' and made a part hereof.

"It is mutually understood and agreed that, whenever the St. Paul Company shall elect to lower the present grade of its track at the point of crossing aforesaid, all the rights hereby granted shall cease and determine; and the Electric Company, its successors, assigns, grantees and lessees, shall and will, upon receiving ten days' notice in writing so to do, at its own sole costs and expense, take up and remove said crossing; and the St. Paul Company shall and will thereupon grant to the Electric Company the right to construct (at such point as may be mutually agreed upon) and thereafter maintain and use a bridge or crossing structure, carrying the track of the Electric Company over and above the right of way and present main track of the St. Paul Company,

and over and above such other track or tracks as the St. Paul Company may hereafter elect to lay at the point of said crossing; it being understood and agreed that such bridge or crossing structure is to be erected and maintained at the sole expense of the Electric Company, and in strict accordance with such plans and specifications as the chief engineer of the St. Paul Company may prescribe. * * *

"Lastly. The grants, covenants, stipulations and agreements hereof shall extend to and be binding upon the respective successors and assigns of the parties hereto, whether so herein expressed or not."

The contract contained other provisions, and among those an agreement on the part of the Electric Company that, whenever its line of railroad should cease to be operated exclusively as an electric line for the carriage of passengers only, it would furnish and erect at its own expense, at its point of crossing, safety appliances commonly known as an interlocking and derailing system. There is no controversy over this part of the contract. The line did cease to be operated exclusively for the carriage of passengers, and the interlocking and derailing system was constructed as agreed. It became, however, useless by reason of the lowering of the tracks of the St. Paul Company as hereinafter stated. In 1902 a survey was made and a profile prepared by the St. Paul Company for an improvement of its entire line across the state of Iowa, by eliminating curves and reducing grades. The profile and plan provided for the lowering of the tracks of the St. Paul Company at Huxley to the extent of 13 or 14 feet. In 1912 the St. Paul Company was actively engaged in the prosecution of the improvement of its line in accordance with the profile and plan of 1902, and as the work progressed towards Huxley, and on June 13, 1912, it served on the receivers of the Electric Company a notice that it had elected to change the grade of its track at the point of crossing, and requesting them to take up and remove the tracks of the Electric Company constituting the crossing, as provided in the agreement of September 5, 1906. The receivers declined to comply with the notice, alleging that neither they, the bondholders, nor trustees were bound by the agreement. Whereupon the St. Paul Company intervened in the foreclosure suit by petition as above stated.

In its petition the St. Paul Company tendered the receivers a right of way for the construction of a temporary track west of the established crossing in order to detour the trains of the Electric Company and to provide for their operation without interruption during the lowering of the grade. A preliminary hearing of the questions in controversy was had on July 20, 1912, and in pursuance thereof the District Court made an order permitting the St. Paul Company to proceed with its work, upon the condition that it should, at its own expense, construct a temporary track and crossing of its railroad for the use of the Electric Company, according to a plan and conditions described. The order provided that all expenses incurred from time to time in providing temporary tracks, crossings, etc., should be paid by the St. Paul Company, and that the question of who should ultimately bear the whole or any portion of such expenses as between the parties under the agreement of September 5, 1906, or under the laws of Iowa, should thereafter be determined by the court. Pur-

suant to this order the St. Paul Company constructed a temporary detouring track and crossing on a right of way provided by it, and the trains of the Electric Company were diverted over the same, while the St. Paul Company proceeded with the lowering of its grade past the crossing. The traffic of the Electric Company was then shifted to the original location, crossing the cut on a wooden bridge, and the St. Paul Company proceeded with the excavation past the crossing of the temporary detour line, which work was pending at the time of the final hearing in the court below. The cut made by the St. Paul Company in lowering its track on its right of way at Huxley was about 13½ feet, which would require an elevation of the Electric Company's road of about 12 feet, making a clearance of 23 feet. The estimated cost of the overhead bridge, consisting of a steel girder spanning two main tracks of the St. Paul Company and approaches, made of piling and earth fills, is $14,000. The cost of the temporary detouring track constructed to provide for the traffic of the Electric Company during the work, was $4,500. The traffic of both roads continued without interruption during the work.

After a final hearing on September 1, 1913, the court below entered a judgment and decree, holding that the rights granted in the agreement of September 5, 1906, ceased and determined on the election of the St. Paul Company to change its grade; that the agreement was void as against public policy, unfair, and inequitable; that, not having been recorded, it was not binding upon the mortgagees or bondholders, who, it was found, were purchasers for value, without notice, actual or constructive, of the agreement; that the St. Paul Company, in changing the grade of its railroad and constructing two main tracks at the point of crossing, was practically building a new railroad, and thereby became a junior line, so far as the crossing was concerned; that all expenses incurred in the construction of the temporary track, crossing, etc., in order to provide for the traffic of the Electric Company without interruption, should be borne by the St. Paul Company, as well as all the expense of the elevation of the Electric road and the construction and maintenance of the permanent overhead crossing. The decree also adjudged that the St. Paul Company should construct and maintain, in perpetuity, the overhead crossing for the use of the Electric Company, which overhead crossing should be of such strength and capacity as to sustain and carry cars and trains of the Electric Company over the same; that the St. Paul Company should pay the expense of elevating the track of the Electric Company, in order to secure a sufficient clearance over the tracks of the St. Paul Company, and should construct the approaches, the grade of which should not exceed 1 per cent.

[1] Enough has been said to make it clear that there is no question here of the right of the Electric Company to cross the tracks of the St. Paul Company, whether we look to the contract or to the laws of Iowa. The question for decision is as to which company shall bear the expense. As the parties made a contract which dealt with this subject, we will first consider whether that contract is binding upon the parties. It is first claimed that the crossing contract

·terminated when the St. Paul Company elected to change its grade. The following language of the contract is relied upon to accomplish this result:

> "It is mutually understood and agreed that, whenever the St. Paul Company shall elect to lower the present grade of its track at the point of crossing aforesaid, all the rights hereby granted shall cease and determine."

If the contract ended with the language quoted there would be force in the suggestion; but the contract proceeds, and grants to the Electric Company the right to construct and thereafter maintain and use a bridge or crossing structure, carrying the track of the Electric Company over and above the right of way and present main track of the St. Paul Company, and over and above such other track or tracks as the St. Paul Company may hereafter elect to lay at the point of crossing. Such bridge or crossing structure to be erected and maintained at the sole expense of the Electric Company. The right to cross at the old grade is terminated by the giving of the notice of election to lower the grade, but the right to cross by an overhead bridge or crossing structure is granted after grade is lowered. When the whole context and object of the contract is considered, it clearly appears that it was only the right to cross at grade that was terminated by giving the notice of election to lower the grade.

Second, it is claimed that the contract is void as ultra vires the Electric Company, and against public policy as the performance of the conditions of the contract would prevent the company from performing its duties as a common carrier. There is certainly no merit in this contention. The whole work of making a new crossing has been completed practically in accordance with the contract without interruption of business on the part of the Electric Company, and it is certainly not ultra vires or against public policy for a common carrier to bear the expense of constructing its own crossing over the tracks of another carrier. Moreover, it is the highest public policy that one should perform his lawful contracts.

Third, it is next urged that the contract is without consideration and void, as the only right granted to the Electric Company is a right given by the laws of Iowa independent of contract. Section 2020 of the Iowa Code is quoted in support of this contention:

> "And such corporation [railway] may construct and carry its railway across, over or under any railway, canal or water course, when it may be necessary in the construction of the same, and in such cases it shall so construct its crossings as not unnecessarily to impede the travel, transportation or navigation upon the railway, canal or stream so crossed. Said corporation shall be liable for the damages occasioned to any person injured by reason of said crossing."

We do not see how the section of the Code quoted helps the Electric Company in any way in regard to the present controversy. The statute says:

> "And such corporation [Electric Company] may construct and carry its railway across, over or under any railway, canal or water course, when it may be necessary in the construction of the same."

This language certainly contains no warrant for saying that the Electric Company can carry its railway across, over, or under the tracks of the St. Paul Company at the expense of the latter. Again, in order that this section of the Code may be held to be valid legislation, it must be construed with reference to the fundamental law of Iowa and of the United States, prohibiting the taking of private property for public use without just compensation; and section 18 of the Iowa Constitution provides that this compensation must be first made or secured to be made to the owner as soon as the damages shall be assessed by a jury. If this be the law, there is no authority anywhere to assess the damages for taking of private property for a public use, except a jury duly impaneled, as provided by law and the Constitution, unless the parties themselves can agree upon the same.

[2] The next question to be considered is: What is a railroad right of way from a property viewpoint? To answer this question we need only cite the following language from the Supreme Court of the United States in Western Union Telegraph Co. v. Penna. R. R. et al., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517:

"A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement. We discussed its character in New Mexico v. United States Trust Co., 172 U. S. 171 [19 Sup. Ct. 128, 43 L. Ed. 407]. We there said (page 183) that, if a railroad's right of way was an easement, it was 'one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it corporeal, not incorporeal, property.' And we drew support for this from a New Jersey case, in which state the rights of way in the case at bar is situated. We quoted N. Y., Susquehanna & Western Railroad v. Trimmer, 53 N. J. Law, 1, 3 [20 Atl. 761], as follows: 'Unlike the use of a private way—that is, discontinuous—the use of land condemned by a railroad company is perpetual and continuous.' And it is held in Pennsylvania 'that a railway company is a purchaser, in consideration of public accommodation and convenience, of the exclusive possession of the ground paid for to the proprietors of it.' Philadelphia & Reading Railroad Co. v. Hummell, 44 Pa. 375 [84 Am. Dec. 457]. It is 'a fee in the surface and so much beneath as may be necessary for support. * * * But, whatever it may be called, it is, in substance, an interest in the land, special and exclusive in its nature.' Pennsylvania Schuylkill Valley R. R. Co. v. Reading Paper Mills, 149 Pa. 18 [24 Atl. 205]; Philadelphia v. Ward, 174 Pa. 45 [34 Atl. 458]; Railway v. Peet, 152 Pa. 488 [25 Atl. 612, 19 L. R. A. 467]. A railroad's right of way has, therefore, the substantiality of the fee, and it is private property, even to the public, in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part, except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given. It can only be taken by the exercise of the powers of eminent domain, and a condition precedent to the exercise of such power is, we said in Sweet v. Rechel [159 U. S. 380, 16 Sup. Ct. 43, 40 L. Ed. 188], that the statute conferring it make provision for reasonable compensation to the owner of the property taken. This condition is expressed with even more emphasis in Cherokee Nation v. Southern Kansas Ry. Co., supra [135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295]."

The following authorities support this view: City of Albia v. C. B. & Q. R. Co., 102 Iowa, 624, 71 N. W. 541, 543; M. & St. L. R. Co. v. C. R. G. & N. W. Ry. Co., 114 Iowa, 502, 87 N. W. 410; 3 Elliott on Railways (2d Ed.) §§ 1119, 1126; Townsend v. M. C. R. R. Co., 42 C.

C. A. 570, 101 Fed. 757; Elkins E. Ry. Co. v. W. M. R. Co. (C. C.) 163 Fed. 724, 733, 735, affirmed 186 Fed. 1022, 108 C. C. A. 557; L. S. etc., R. R. Co. v. C. & W. I. R. R. Co., 97 Ill. 506; O. C. R. Co. v. L. & N. R. Co. (Ky.) 94 S. W. 22; W. & S. L. R. Co. v. P. T. Co., 56 W. Va. 18, 48 S. E. 746; M. & C. R. Co. v. B. S. & T. R. Co., 96 Ala. 571, 11 South. 642, 18 L. R. A. 166; State v. N. P. Co., 49 Wash. 78, 94 Pac. 907; B. & L. R. Co. v. S. V. Ry. Co., 2 Cal. App. 546, 84 Pac. 298, 304.

[3] It necessarily results that the laws of Iowa did not grant to the Electric Company all that the contract did. The St. Paul Company by virtue of the contract waived its right to compensation for the taking of its property, and for the purposes of determining whether there was any consideration for the contract this court or the court below cannot say what the amount of such compensation should be. Taking into consideration the result of the trial below, the damages are very considerable to the St. Paul Company. Further than this, by section 2063 of the Iowa Code it is provided, if the companies in regard to any new crossing cannot agree upon the terms thereof, then the existing road may apply to the District Court for relief, thus recognizing the right of the companies to agree upon the terms on which a crossing may be made.

We are clearly of the opinion that the waiver by the St. Paul Company of the right to compensation, regardless of the amount of such compensation, was a good consideration for the contract.

[4] It is next claimed that by the effort to improve its road by the St. Paul Company it became the junior road in relation to the Electric Company, and therefore must deal with the Electric Company in order to pass through the town of Huxley. The establishment of such a doctrine might prevent any substantial improvement on the part of a senior road, which certainly would be against public policy, and we find no warrant in law for such a position. P. & C. R. Co. v. S. W. Ry. Co., 77 Pa. 173; St. L., I. M. & S. Ry. Co. v. Ft. S. & V. B. Ry. Co., 104 Ark. 344, 148 S. W. 531, 537; Lehigh & New England R. Co. v. Del., L. & W. R. Co., 240 Pa. 401, 87 Atl. 709; L. S. & M. S. Ry. Co. v. N. Y. & St. L. Ry. Co., 8 Fed. 858; S. R. Co. v. P. S. & N. R. Co., 203 Pa. 176, 52 Atl. 88; State ex rel. N. C. Ry. v. N. P. Ry. Co., 49 Wash. 78, 94 Pac. 907; State ex rel. Northern Pacific Railway Co. v. Railroad Commission of Wisconsin, 140 Wis. 145, 121 N. W. 919; B. & A. R. R. Co. v. Cambridge, 159 Mass. 283, 287, 34 N. E. 382; A. A. & N. M. R. R. Co. v. D., L. & N. R. Co., 62 Mich. 564, 29 N. W. 500, 4 Am. St. Rep. 875; West Jersey & S. R. Co. v. Atlantic City & S. T. Co., 65 N. J. Eq. 613, 622, 56 Atl. 890.

[5] It is next urged that the Old Colony Trust Company and the American Company occupy the position of innocent purchasers, and that therefore the lien of the mortgagees given to secure the bonds of the Electric Company is superior to any rights of the St. Paul Company growing out of the contract of September 5, 1906, and the failure to record the contract is urged in support of this position. The contract was not an instrument that required to be recorded by the laws of Iowa. It was simply a contract allowing the Electric Company to

cross the tracks of the St. Paul Company without any expense whatever, except the expense of constructing its own crossing. It created no lien upon the right of way of the Electric Company. It was simply a contract providing for the operation of the two roads at the point in question, and by its very terms was to extend to and be binding upon the respective successors and assigns of the parties thereto. It was clearly a legal contract, not in conflict with the laws of the state of Iowa or the public policy thereof, and seemingly in line with the statutes of that state regulating the matters concerning which the contract was made.

The cost of constructing the temporary crossing by means of a detour track west of the main crossing was not mentioned in the contract, but we do not see why such work should not have been in contemplation of the parties at the time the contract was entered into, as the Electric Company knew that the lowering of the grade of the St. Paul Company was a part of its policy; in fact, it was mentioned in the contract, but, as there was no specific agreement about it, it remains to be adjusted by the trial court under its powers as a court of equity in managing the receivership.

The decree below, therefore, will be reversed, and the case remanded, with instructions to adjust the rights of the parties in accordance with the contract of September 5, 1906, so far as it covers the same, and make such other disposition of the matters involved between the parties as law and justice may require.